IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DERRICK PEREZ SCOTT,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀1:19-cv-1077
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
RESOLVE PARTNERS, LLC,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀)

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Defendant Resolve Partners, LLC's ("Defendant") Motion for Summary Judgment. (Doc. 104.) Plaintiff Derrick Perez Scott's ("Plaintiff") complaint alleges one claim for willful violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681e(b), or, in the alternative, negligent violation of § 1681e(b). (Doc. 1.) Defendant has admitted its negligence, but denies its negligence proximately caused any recoverable damages, and denies it willfully violated 15 U.S.C. § 1681e(b). (Doc. 105 at 5.) Defendant moves for summary judgment on the issues of proximate cause and willfulness. (Id. at 5–6.)

The parties focus the bulk of their willfulness arguments on Defendant's procedures regarding middle name and common names. As will be explained briefly herein, this court has

doubts as to whether the middle name and common names procedure here is evidence of a willful violation. However, this court finds that issues of fact exist as to Defendant's policies on verifying criminal records which preclude summary judgment in favor of Defendant. Issues of fact also exist as to causation. Therefore, this court will deny Defendant's Motion for Summary Judgment. (Doc. 104.)

## I.   **FACTUAL BACKGROUND**

Defendant is a consumer reporting agency, within the meaning of FCRA, that provides employment screening services. (Ex. C, Russell Dallas Church Deposition ("Church Dep.") (Doc. 105-3) at 20, 30.)[1] Full House Marketing, Inc. ("Full House") is a temporary staffing company that, among other things, hires leasing agents for Residential Property Management companies. (Ex. I, Declaration of Rebecca Rosario ("Rosario Decl.") (Doc. 105-9) at 1.) In 2012, Full House entered into an agreement with Defendant to provide employment screening reports for potential hires. (Church Dep. (Doc. 105-3) at 29-30.) Full House uses screening reports produced by Defendant to make hiring decisions. (Id. at 30.)

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

On March 15, 2019, Plaintiff applied online with Full House for employment as an Apartment Leasing Agent. (See Ex. D, Application from Derrick Scott for Apartment Leasing Agent ("Mar. Application") (Doc. 109-5); Ex. F, Rebecca Rosario Deposition ("Rosario Dep.") (Doc. 105-6) at 40.) At the request of Full House, Defendant completed a criminal background report on Plaintiff. (Ex. E, Simone Salazar Deposition ("Salazar Dep." (Doc. 105-5) at 145–47.) That background report contained information pertaining to Derrick Lee Scott, who shared a birthday with Plaintiff and who, unlike Plaintiff, has a criminal record. (Id. at 237; Ex. H, Derrick Perez Scott Deposition II ("Scott Dep. II") (Doc. 105-8) at 20.) After Defendant completed the inaccurate report, it provided the report to Full House. (Salazar Dep. (Doc. 105-5) at 234.)

Full House subsequently communicated to Plaintiff that his background did not meet its guidelines for employment and terminated the application process. (Rosario Dep. (Doc. 105-6) at 39–40.)

### A.    Defendant's Policies and Procedures

When a consumer applies to Full House, Full House obtains their consent to run a background check on them. (Church Dep. (Doc. 105-3) at 44.) The consumer fills out an authorization form, supplied by Defendant, and provides six "identifiers":

- 3 -

first and last name; social security number; date of birth; street address; e-mail address; and driver's license number and date of issuance to Full House through an online portal. (Salazar Dep. (Doc. 105-5) at 149; Church Dep. (Doc. 105-3) at 48.) First and last name combined are considered one identifier. (See Salazar Dep. (Doc. 105-5) at 149.) The authorization form does not include a field to enter in a middle name. (Church Dep. (Doc. 105-3) at 48.) After the identifiers are entered into the online portal, which is accessible by both Full House and Defendant, a background check request is automatically triggered. (Id. at 50.)

Defendant contracts with Trade House Data ("Trade House") to provide criminal records for employment screenings.[2] (Ex. D, Michael Cook Deposition ("Cook Dep.") (Doc. 105-4) at 99–100.) Trade House is a private data vendor that supplies criminal charges and convictions to Defendant from a "national alias database report." (Id. at 134.) Trade House pulls its data from multiple online sources, such as backgroundchecks.com and RapidCourt. (Id. at 100.) Trade House conducts its search based on the identifiers supplied by Defendant and returns a "pointer file" to Defendant with possible criminal records of an

---

[2] Defendant also uses other data vendors to supply criminal records, but used Trade House Data for Plaintiff's report in this instance. (Church Dep. (Doc. 105-3) at 117.)

- 4 -

applicant. (Church Dep. (Doc. 105-3) at 166.) Per the contract between Defendant and Trade House, Trade House explicitly disclaims the accuracy, reliability, or content of any public records provided through its services. (Id. at 120–21.)

Per Defendant's policies, if the "pointer file" returns a criminal charge or conviction, Defendant's employees, or processors, take steps to verify the record belongs to the applicant. (Id. at 126–27.) It is not disputed that Defendant's policy requires processors to match at least two identifiers from the pointer file to the information provided by the applicant before including a criminal record in the applicant's report, and three identifiers are required if an applicant has a common name. (See Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") (Doc. 105) at 8; Pl.'s Mem. of Law in Opp'n to Def. Resolve Partners, LLC's Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 109) at 13–14; Salazar Dep. (Doc. 105-5) at 138–39; Church Dep. (Doc. 105-3) at 98.) Defendant does not maintain a list of common names — processors use their discretion to determine whether a third identifier is required. (Salazar Dep. (Doc. 105-5) at 112.)

Beyond using identifiers to match an applicant's identity and records returned in the pointer file, there is conflicting evidence of other procedures Defendant uses or does not use to

- 5 -

verify criminal records. For example, Defendant's policy and
procedure manual[3] states: "[Defendant] does not report adverse
criminal record information that is derived from a
nongovernment-owned or sponsored/supported database until and
unless the information has been verified with the jurisdiction
or venue that maintains the official record for the
jurisdiction." (Church Dep. (Doc. 105-3) at 165.) In other
words, the manual states that if the pointer file, created using
Trade House's private database, returns adverse information,
Defendant orders a criminal record from the local court that
maintains the official record. (Id. at 166.)

In contrast, the How-To Guide states that "when trying to
match the information processors may have to access the case
records directly in order to confirm the case matches the
applicant." (Salazar Dep. (Doc. 105-5) at 137, 139 (emphasis

---

[3] An examination of the record shows that in 2018 Defendant
adopted a formal policy and procedure manual ("Manual"), (Church
Dep. (Doc. 105-3) at 143, 147–49), and, later, a more informal
"quick reference"/ "how-to guide" ("How-To Guide") for verifying
criminal records, (Cook Dep. (Doc. 105-4) at 126). Neither
document has been attached to the pleadings as an exhibit but
both are referenced throughout the depositions. Exhibit 8 is the
How-To Guide, (see id. at 120), and Exhibit 36 is the Policy and
Procedure Manual (see Church Dep. (Doc. 105-3) at 147–49). As
referenced in the depositions, Exhibit 4 is an email with a
policy attached. It is unclear if the attachment in Exhibit 4 is
different from the policy in Exhibit 36. (See id.; Cook Dep.
(Doc. 105-4) at 56–61.)

added).) Simone Salazar, Defendant's employee who processed Plaintiff's record, testified that she would verify a pointer file with local court records if the file did not give a disposition of the case. (Id. at 145.) Russell Church, testifying on behalf of Defendant, stated that Defendant verifies a pointer file with local records only in certain circumstances: "We verify [criminal records] through the national database that . . . Trade House provides us, and if they look accurate and they meet the personal identifiers, where we're reasonably sure it's the person with the maximum accuracy, then we'll report it." (Church Dep. (Doc. 105-3) at 133.)

There are other procedures referenced in the record with conflicting evidence as to how often they are followed. For example, the How-To Guide directs processors to "use TLO" when processing a screening report if there are "mismatches." (Id. at 219.) "TLO" is a "skip tracing service" that is used as "a resource to help [processors] provide accurate information to clients, but there's no policy in regards to TLO." (Cook Dep. (Doc. 105-4) at 75–76.) Michael Cook, the operations manager for Defendant, testified that Defendant does not conduct a TLO search for every screening report, (id. at 25, 75), but Ms. Salazar testified that a TLO report is "required" "to verify the name and the birth date" of the applicant, (Salazar Dep. (Doc.

105-5) at 169). Defendant does not have a formal policy in place governing the use of TLO reports. (Id. at 169.)

**B.** **Facts Specific to Plaintiff's Claim**

Plaintiff first applied with Full House in January 2019, but was initially not considered for a position. (Rosario Decl. (Doc. 105-9) at 2.) Plaintiff applied again in March 2019. (See Mar. Application (Doc. 109-5); Rosario Dep. (Doc. 105-6) at 40.) Plaintiff submitted an application and a resume. (Rosario Decl. (Doc. 105-9) at 2.)

As part of the March application process, Plaintiff authorized Full House to perform a background check. Plaintiff provided his first and last name, social security number, date of birth, address, and driver's license number to Full House through an online portal. (Salazar Dep. (Doc. 105-5) at 148.) On March 15, the same day Plaintiff applied, Full House requested a report from Defendant and provided Plaintiff's identifiers. (Id. at 148, 163.)

Simone Salazar, Defendant's employee, conducted the background report of Plaintiff. On March 27th, 2019, Ms. Salazar used Trade House to conduct a "national alias criminal search." (Id. at 165.) The search returned a report from the Maryland Admin Office of Courts, listing the offender as "Derrick Lee Scott." (Id. at 167.) Ms. Salazar testified that if the search

- 8 -

returned a report with a different name variation than the one provided, the processor would use TLO to verify the name and date of birth of the applicant using their social security number. (Id. at 168, 174.)

Ms. Salazar testified she ran a TLO report for Plaintiff in March 2019.[4] (Id. at 170-71.) She inputted Plaintiff's social security number, and TLO reported his name as "Derrick Perez Scott." (Id. at 174-75.) The TLO report confirmed Plaintiff's first and last name, date of birth, address history, and social security number were consistent with the identifiers Plaintiff provided in the authorization form. (Id. at 176.) The TLO report also confirmed that Derrick Lee Scott's social security number, middle name, and address history was different from Plaintiff's. (Id. at 186-88.) Ms. Salazar failed to make any changes to Plaintiff's report, despite the results of the TLO report. (See id. at 201-02.)

Ms. Salazar testified that in this circumstance, Defendant's policy and procedure manual would require her to reach out to Full House to obtain Plaintiff's middle name, but she did not. (Id. at 178, 79.) However, she then testified that this policy is not stated in the manual, but that she would

_____

[4] Ms. Salazar testified she did not save a copy of the TLO report, but her supervisor had her reproduce the report in February of 2020. (Salazar Dep. (Doc. 105-5) at 171, 205.)

- 9 -

normally reach out to the client if they are having trouble completing a report or if they need to confirm a middle name. (Id. at 179.)

Ms. Salazar erroneously matched Plaintiff to Derrick Lee Scott's criminal records. She considered Derrick Scott a common name. (Id. at 181.) Ms. Salazar agreed that "there was enough information in the TLO report to indicate that there were two separate individuals with two separate middle names with two separate social security numbers." (Id. at 188.) Ms. Salazar admits that if she had the middle name, it would have helped verify, but that she was following company policy when creating the report. (Id. at 204.)

The report was completed and sent to Full House on March 27th, 2019. (Rosario Dep. (Doc. 105-6) at 18.) Plaintiff's employment screening report sent to Full House contained three criminal charges, one felony and two misdemeanors, belonging to Derrick Lee Scott. (Salazar Dep. (Doc. 105-5) at 200.) Full House rejected Plaintiff's application because his background check did not meet its guidelines for employment. (Rosario Dep. (Doc. 105-6) at 38.) Full House communicated this to Plaintiff via text, but Plaintiff did not follow up to ask why his background was not within its guidelines. (Ex. A, Derrick Perez Scott Deposition I ("Scott Dep. I") (Doc. 105-1) at 89.)

On May 5th, 2019, Plaintiff re-applied to the same
position. (Rosario Dep. (Doc. 105-6) at 40.) Plaintiff gave his
authorization again for a background check. (Id.) However, Full
House did not request a new, second report from Defendant. (Id.
at 42.) Per Full House's policies, Full House did not request a
second background report because it already had a background
report less than six months old from Plaintiff's first
application in March. (Salazar Dep. (Doc. 105-5) at 234.)
However, Mr. Cook testified that Defendant should have processed
a separate report in this instance. (Cook. Dep. (105-4) at 180.)
Defendant did not run a new report on Plaintiff; it gave Full
House the same inaccurate report from March after Plaintiff
applied in May. (Salazar Dep. (Doc. 105-5) at 234.)

Full House again communicated with Plaintiff that his
background did not meet its guidelines for employment. (Rosario
Dep. (105-6) at 40.) Plaintiff asked Full House why his
background did not meet the guidelines, and Full House told him
to direct his questions to Defendant. (Id. at 41.)

C.  **Plaintiff Disputes Report**

Plaintiff contacted Defendant to dispute his report on
May 7th, 2019. (Salazar Dep. (Doc. 105-5) at 217.) Defendant
sent the dispute to Trade House, and Trade House conducted a
re-investigation. (See id. at 217, 219.) On May 31, 2019, Trade

- 11 -

House completed the re-investigation, determined that the crimes did not belong to Plaintiff, and removed the crimes from his report and the database. (Id. at 220.) Defendant corrected Plaintiff's consumer report, removing the crimes. (Id.) The corrected report was emailed to Plaintiff and confirmed the disputed criminal offenses were removed from his report. (Id. at 223.) Plaintiff did not apply for employment with Full House any time after May 2019. (Rosario Dep. (Doc. 105-6) at 15.)

There is conflicting evidence as to whether Full House would have hired Plaintiff but for the inaccurate background report. A Full House recruiter testified that she "felt confident in plaintiff before requesting the background check." (Id. at 46.) However, it appears that the recruiter subsequently learned that Plaintiff included false statements on his application and that, if Full House knew that they were false at the time, it would have stopped considering his application. (Rosario Decl. (Doc. 105-9) at 2.)

## II.  **PROCEDURAL HISTORY**

On October 18, 2019, Plaintiff filed a complaint alleging one claim for willful violation of 15 U.S.C. § 1681e(b), or, in the alternative, negligent violation of § 1681e(b). (Complaint ("Compl.") (Doc. 1) at 10–11.) After discovery concluded, Defendant filed a motion for summary judgment, (Doc. 104), and a

brief in support, (Def.'s Br. (Doc. 105)). Plaintiff responded in opposition, (Pl.'s Resp. (Doc. 109)), and Defendant replied, (Discussion of Matters Newly Raised in Pl.'s Resp. to Resolve Partners' Mot. to Compel [sic] ("Def.'s Reply") (Doc. 110)).

## III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . ., the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718–19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." Id. at 719 (citing Anderson, 477 U.S. at 247–48).

- 13 -

## IV. __ANALYSIS__

Under the FCRA, consumer reporting agencies are charged with "adopt[ing] reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). The FCRA imposes civil liability on any consumer reporting agency that is negligent, 15 U.S.C. § 1681o, or willful, 15 U.S.C. § 1681n, in failing to comply with its requirements.

Plaintiff's complaint alleges one claim for willful violation of 15 U.S.C. § 1681e(b), or, in the alternative, negligent violation of § 1681e(b). (Compl. (Doc. 1) at 10-11.) Defendant admits negligent violation of 15 U.S.C. § 1681e(b), but denies its negligence proximately caused any recoverable damages, and denies any violations were willful. (Def.'s Br. (Doc. 105) at 5.) Defendant moves for summary judgment on the issues of (1) willfulness and (2) proximate cause.

- 14 -

## A.    **FCRA Violation**

15 U.S.C. § 1681e(b) requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy" of its reports. 15 U.S.C. § 1681e(b). An agency violates § 1681e(b) "if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." Dalton v. Cap. Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001). There is no dispute between the parties that Plaintiff's consumer report contained inaccurate information. (See Def.'s Br. (Doc. 105) at 14–15; Pl.'s Resp. (Doc. 109) at 14.)

Once a court determines inaccurate information was provided, the court must consider whether the consumer reporting agency failed to follow reasonable procedures for assuring maximum possible accuracy. McIntyre v. RentGrow, Inc., 34 F.4th 87, 97 (1st Cir. 2022). If so, a plaintiff must show that the agency's failure to comply was knowing or reckless." Id. at 99; see also Fernandez v. RentGrow, Inc., 341 F.R.D. 174, 191–97 (D. Md. 2022) (analyzing first whether Defendant followed reasonable procedures within the meaning of FRCA, then willfulness, on a motion for summary judgment).

- 15 -

The Fourth Circuit has held that "the plaintiff bears the burden under § 1681e(b) to show that [a] consumer reporting agency did not follow reasonable procedures."[5] <u>Dalton</u>, 257 F.3d at 416. Whether a credit reporting agency followed "reasonable procedures" within the meaning of the FCRA will be a "jury question[] in the overwhelming majority of cases." <u>Id.</u> (citing <u>Guimond v. Trans Union Credit Info. Co.</u>, 45 F.3d 1329, 1333 (9th Cir. 1995)).

Defendant has admitted a negligent violation of 15 U.S.C. § 1681e(b). (Def.'s Br. (Doc. 105) at 5.) Thus, the only issue that remains is whether Defendant willfully violated 15 U.S.C. § 1681e(b).

The FCRA does not impose strict liability on consumer reporting agencies for inaccuracies in reporting. Instead, the FCRA allows for enhanced penalties for willful violations. <u>See</u> 15 U.S.C. § 1681n; <u>Dalton</u>, 257 F.3d at 417. When the claim is

---

[5] There appears to be a circuit split as to who bears the burden of proving the reasonableness of the agency's procedures. The Fourth and D.C. Circuits have held that the plaintiff bears the burden of showing the defendant's procedures were unreasonable. <u>See</u> <u>Dalton</u>, 257 F.3d at 416; <u>Stewart v. Credit Bureau, Inc.</u>, 734 F.2d 47, 51 (D.C. Cir. 1984). The Ninth and Eleventh Circuits have suggested that the agency bears the burden of showing that it acted reasonably. <u>See</u> <u>Guimond v. Trans Union Credit Info. Co.</u>, 45 F.3d 1329, 1333 (9th Cir. 1995) ("[A]n agency can escape liability if it establishes that an inaccurate report was generated despite the agency's following reasonable procedures."); <u>Cahlin v. Gen Motors Acceptance Corp.</u>, 936 F.2d 1151, 1156 (11th Cir. 1991) (same).

- 16 -

one alleging a willful violation of the FCRA (15 U.S.C.
§ 1681n), "[p]laintiffs must 'show that the defendant knowingly
and intentionally committed an act in conscious disregard for
the rights of the consumer.'" Ausherman v. Bank of Am.
Corp., 352 F.3d 896, 900 (4th Cir. 2003) (quoting Dalton, 257
F.3d at 418).

A willful violation under FCRA includes not only knowing
violations, but reckless ones as well. Safeco Ins. Co. of Am. v.
Burr, 551 U.S. 47, 69 (2007) (holding willfulness under 15
U.S.C. § 1681n includes a reckless disregard of the plaintiff's
rights); Cortez v. Trans Union, LLC, 617 F.3d 688, 721 n.39 (3d
Cir. 2010) ("The Supreme Court's decision in Safeco defined the
standard for all willful violations of the FCRA.").

A consumer reporting agency "does not act in reckless
disregard of [FCRA] unless the action is not only a violation
under a reasonable reading of the statute's terms, but shows
that the company ran a risk of violating the law substantially
greater than the risk associated with a reading that was merely
careless." Safeco Ins. Co. of Am., 551 U.S. at 69.

If an agency is on notice that its procedure is an
unreasonable violation of FCRA, a violation may be willful. See
id. at 70; Fernandez, 341 F.R.D. at 196-97 (explaining a Third
Circuit opinion decided eight years prior to the current case

- 17 -

that held a substantially similar policy violated FCRA is a factor of a defendant's willful noncompliance). Such notice may come from the courts of appeals or authoritative guidance from the Federal Trade Commission ("FTC"). See Safeco Ins. Co. of Am., 551 U.S. at 70; Fernandez, 341 F.R.D. at 196.

Evidence that other consumers have lodged similar complaints against the agency is also evidence of willfulness. Dalton, 257 F.3d at 418; see also Smith v. LexisNexis Screening Sols., Inc., 837 F.3d 604, 611 (6th Cir. 2016) (holding that the plaintiff failed to establish willfulness where the plaintiff "presented no evidence that anyone had lodged similar complaints against [the defendant]"); Fernandez, 341 F.R.D. at 196 (finding the plaintiff created a dispute of material fact as to willfulness when there was evidence that Defendant received at least 71 similar complaints).

A low dispute rate is evidence that a consumer reporting agency has not willfully violated FCRA. See Smith, 837 F.3d at 610-11; Fernandez, 341 F.R.D. at 196 (denying summary judgment, but stating that the defendant's 0.1% dispute rate weakened the plaintiff's willfulness argument).

Plaintiff argues the following procedures "created an unjustifiably high risk of harm that was either known or so obvious that it should have been known" to Defendant:

- 18 -

1) Resolve failed to require Full House to submit
Plaintiff's middle name with its request for his
employment report;
2) Resolve's public records vendor explicitly
disclaimed the accuracy and reliability of its
criminal record pointer data in its contract, but
Resolve relied on it without obtaining or cross-
referencing the physical court records;
3) Resolve failed to use Plaintiff's middle name of
"Perez" contained in the report, which Experian
provided, to rule out any relation between criminal
Derrick Lee Scott;
4) Resolve failed to obtain the best public record of
the crimes that it reported, which contain the
criminal defendant's full middle name;
5) Resolve has insufficient procedures for preparing
reports for consumers with common names;
6) Resolve failed to implement any procedures
governing its Processors' use of TLO reports for
purposes of verifying a consumer's identity; and
7) Despite having Plaintiff's SSN, Resolve failed to
use it when searching for criminal records and failed
to verify whether the criminal records reported
matched Plaintiff's SSN. Instead, Resolve falsely
stated the match was based on SSN.

(Pl.'s Resp. (Doc. 109) at 20-21.) Plaintiff also notes that

"existing procedures were not followed" in this case. (Id. at

18.)

Defendant argues "its procedures were reasonable under

section 1681e(b), and that any action in violation of 1681e(b)

was due to an employee's isolated mistake." (Def.'s Br. (Doc.

105) at 23.) Defendant points to the fact that at least five

other consumer reporting agencies made a similar mistake in the

two years following Defendant's false report. (Id. at 17.) It

also cites its low dispute and error rate from 2017 to 2019.

- 19 -

(Id.; Cook Dep. (Doc. 105-4) at 213–15.) From 2015 to 2019, Defendant made one other middle name mismatch error, aside from Plaintiff's. (Church Dep. (Doc. 105-3) at 228, 230, 231.)

Plaintiff's arguments can be compiled into two main categories: (1) Defendant's policies and procedures regarding the use of local court records or TLO to verify criminal records obtained from Trade House; and (2) Defendant's policies and procedures regarding middle name and common names. Although this court is not persuaded a material issue of fact exists as to whether Defendant's three identifiers policy for common names would, standing alone, support a finding of willfulness, the court finds there is a genuine dispute of material fact as to Defendant's policies regarding the use of local court records and TLO to verify criminal records from Trade House.

## 1. **Defendant's Policies and Procedures Regarding Verifying Criminal Records**

There is conflicting evidence in the record regarding Defendant's policy of verifying criminal records. Although Defendant's and Plaintiff's briefs focus on the policy and procedure regarding middle names and common names, Plaintiff argues that Defendant's failure to obtain local records, and failure to implement procedures governing its processors' use of TLO, is unreasonable. (Pl.'s Resp. (Doc. 109) at 21.)

- 20 -

Defendant's brief and response fail to mention the use of local court records or TLO.

There is a material issue of fact as to whether Defendant's verification procedures were reasonable. It is not unreasonable for a consumer reporting agency to rely on the accuracy of its data vendor when there is evidence that the data vendor is reasonably reliable. See Myrick v. Equifax Info. Servs., LLC, No. 15-CV-562, 2017 WL 3324467, at *3 (E.D.N.C. Aug. 3, 2017). Evidence of reliability can include the vendor's reputation in the community, an agency's own investigation, an agency's longstanding business relationship with the vendor, and contractual requirements that a vendor provide accurate information and comply with the FCRA. Id. at *4.

A defendant may also reasonably rely on records pulled directly from the local court system. Primrose v. Castle Branch, Inc., No. 14-CV-235, 2017 WL 57800, at *7 (E.D.N.C. Jan. 3, 2017). "[A] reasonable jury could find that a FCRA-compliant credit reporting agency would have acquired the criminal records directly from the court in order to verify [an offender's identifiers] . . . ." Fernandez, 341 F.R.D. at 195.

In this case, Defendant did not cross-reference the pointer file with local court records. (Church Dep. (Doc. 105-3) at 215.) Defendant ran a TLO search in an attempt to verify that

- 21 -

Plaintiff's identity matched the criminal records in the pointer file but failed to make any changes to the report based on the TLO search. (Salazar Dep. (Doc. 105-5) at 170–71.) Defendant does not have a policy governing its processors' use of TLO. (Id. at 169.) Additionally, it is unclear from the record when Defendant is required to use local court records to verify an applicant's identity. See supra pp. 5–7. Defendant's data vendor explicitly disclaims the accuracy, reliability, or content of any public records provided through its services. (Church Dep. (Doc. 105-3) at 120–21.)

Defendant's procedures regarding verifying its pointer file using local court records or other sources is material to whether Defendant's procedures were unreasonable within the meaning of 15 U.S.C. § 1681e(b). Because there is a dispute of material fact, summary judgment as to willfulness will be denied.

## 2. **Middle Name and Common Name Policies and Procedures**

Plaintiff argues that Defendant's failure to require a consumer's middle name before running a report and inadequate procedures for dealing with common names are unreasonable. (Pl.'s Resp. (Doc. 109) at 20–21.) It is not disputed that Defendant's policy requires processors to match at least two identifiers from the pointer file to the information provided by the applicant before including a criminal record in the applicant's report, and three identifiers are required if an applicant has a common name. (See Def.'s Br. (Doc. 105) at 8; Pl.'s Resp. (Doc. 109) at 13–14.) Defendant's authorization form does not require Full House to obtain middle names from applicants. (Church Dep. (Doc. 105-3) at 48.) In this instance, Defendant matched Plaintiff's record based only on first and last name and date of birth, despite acknowledging Plaintiff's name, Derrick Scott, as common. (Salazar Dep. (Doc. 105-5 at 180–81.)

This court is not persuaded an issue of fact exists as to whether Defendant's three identifiers policy for common names would, standing alone, support a finding of willfulness.

Plaintiff argues that the Sixth Circuit's decision in Smith, guidance from the FTC, and Defendant's other similar

consumer disputes put Defendant on notice that its procedures involved a high risk of harm.

In Smith, the Sixth Circuit upheld the jury's finding of negligence because the defendant failed to require a middle name when compiling a criminal record report for an applicant with a common name ("David Smith"). 837 F.3d at 610 ("The jury could conclude that a reasonably prudent CRA, when presented with such a common name, would have required additional identifying information — like a middle name — to heighten the accuracy of its reports.").

However, the court held that the defendant did not act willfully when: (1) the agency required the applicant's birthdate; (2) the agency would use a person's middle name and social security number if provided; (3) the agency's procedures had kept its dispute rate at 0.2%; and (4) the agency corrected its mistake shortly after the plaintiff complained. Id. at 610–11.

Here, like Smith, Defendant required an applicant's date of birth to run a report, (Church Dep. (Doc. 105-3) at 178), and Defendant corrected its mistake within thirty days after Plaintiff disputed the report, (Salazar Dep. (Doc. 105-5) at 220). Furthermore, Defendant's policy required "additional identifying information" "to heighten the accuracy of its

- 24 -

reports" when dealing with a common name, <u>Smith</u>, 837 F.3d at
610, even though its policy did not explicitly require a middle
name as an additional identifier. (Church Dep. (Doc. 105-3) at
48, 98.)

On the other hand, Defendant's employee did not use a third
identifier in this case, despite the fact she considered Derrick
Scott a common name. Additionally, Defendant had the means to
further verify Plaintiff's record because it had access to
Plaintiff's middle name and social security number, but it
failed to utilize these identifiers to rule out the convictions
of Derrick Lee Scott.

These facts, standing alone, might give rise to a concern
that Defendant's failure to follow its purported procedure in
this instance reflect a systemic issue, rather than an isolated
mistake. However, Defendant's low dispute and error rate — much
lower than the dispute rate in <u>Smith</u> — suggests that this case
is the result of an isolated mistake.[6]

---

[6] To be clear, a low dispute and error rate is not per se
evidence that Defendant did not willfully violate 15 U.S.C.
§ 1681e(b). However, the low dispute rate certainly weakens
Plaintiff's argument that Defendant's procedures are
unreasonable, or that Defendant's failure to follow some
procedures in this instance amounts to a willful violation. <u>See
Fernandez v. RentGrow, Inc.</u>, 341 F.R.D. 174, 196 (D. Md. 2022)
(denying summary judgment, but stating that Defendant's 0.1%
dispute rate weakens Plaintiff's argument).

Smith puts consumer reporting agencies on notice that a failure to use heightened procedures for common names may be unreasonable. Here, however, there is no dispute that Defendant's policies required the use of a third-identifier for common names, and Plaintiff's evidence fails to establish anything more than the fact Defendant's employee failed to follow policy and use a third identifier in this instance.

Plaintiff also cites guidance from the FTC in support of his argument that failing to require a middle name is evidence of a reckless violation:

> Certain practices may be indicators that a background screening company isn't following reasonable procedures. For example, if a report lists criminal convictions for people other than the applicant or employee — for instance, a person with a middle name or date of birth different from the applicant's — that raises FCRA compliance concerns.

What Employment Background Screening Companies Need to Know About the Fair Credit Reporting Act, Fed. Trade Comm'n (Apr. 14, 2016), https://www.ftc.gov/business-guidance/resources/what-employment-background-screening-companies-need-know-about-fair-credit-reporting-act; (Pl.'s Resp. (Doc. 109) at 28).

Even assuming arguendo, that this blog post from the FTC's website constitutes the type of "authoritative guidance" referenced in Safeco, it only echoes the concern raised in Smith. The FTC guidance could establish, at most, that not

- 26 -

having special procedures for dealing with common names may be unreasonable. However, as explained above, Defendant required a third identifier for dealing with common names.

Plaintiff also argues that the fact that Defendant received similar consumer disputes put Defendant on notice that its procedures involved a high risk of harm. From January 15, 2015, to December 12, 2019, Defendant logged 241 disputes. (Church Dep. (Doc. 105-3) at 228.) Of those disputes, there were six instances where Defendant erroneously reported a criminal record on a consumer's report that did not belong to them. (Id. at 229.) Out of the six, two involved a middle name mismatch, one of which was Plaintiff's. (Id. at 230, 231.)

Plaintiff argues that because Defendant has previously mismatched consumers with common names, this case is more similar to Williams v. First Advantage LNS Screening Sols., Inc., 238 F. Supp. 3d 1333, 1345 (N.D. Fla. 2017) ("Williams II"), overruled on other grounds, 947 F.3d. 735 (11th Cir. 2020), than to Smith.

Plaintiff argues Smith "only applies in circumstances, unlike the case at bar, where an error was the first of its kind." (Pl.'s Br. (Doc. 109) at 25 (citing Williams II). In Williams II, an agency returned two inaccurate background

reports <u>on the same applicant</u>, after the applicant disputed his inaccurate report the first time. The court stated:

> It is unquestionable that a single inaccuracy, by itself, does not amount to a willful FCRA violation. That premise is just inapplicable here. Unlike <u>Smith</u>, this wasn't a single inaccuracy; it was one of thousands. Nor was it First Advantage's first FCRA violation based on its use of a first name, last name, and date of birth match; in fact, it happened <u>twice</u> to the same individual in this case.

<u>Williams</u>, 238 F. Supp. 3d at 1346.

Here, Defendant made two errors based on middle name mismatches for different applicants.[7] The defendant in <u>Williams II</u> made the same error as to the same applicant twice, after being alerted of its first error. <u>Williams</u>, 238 F. Supp. 3d at 1346. The fact that Defendant had received a single prior dispute based on a middle name mismatch makes this case more like <u>Smith</u> than <u>Williams II</u>. <u>See Fernandez</u>, 341 F.R.D. at 196 (the plaintiff argued 71 similar disputes put the defendant on notice that its procedures violated the FCRA).

Thus, this court is not convinced that a failure to use a middle name when running a report for a consumer with a common name is a willful violation of FCRA when an agency has other

---

[7] Although Defendant re-sent the same erroneous report to Full House twice, once in March and again in May, Plaintiff did not dispute the March report, and Defendant did not complete a new consumer report for Plaintiff in May; it sent a copy of the March report per Full House's policies. (Rosario Dep. (Doc. 105-6) at 42.)

heightened procedures in place. Regardless of these findings, there is a material issue of fact as to Defendant's policies regarding report verification. This court finds the relevance and admissibility of Plaintiff's arguments are matters best left to be addressed at trial.

**B.** **Proximate Cause of Plaintiff's Compensatory Damages**

Defendant moves for summary judgment on the grounds that even if it negligently violated 15 U.S.C. § 1681e(b), its negligence was not the proximate cause of Plaintiff's alleged compensatory damages. This court will deny Defendant's motion for summary judgment as to causation.

A consumer may recover actual damages from a negligent FCRA violation. 15 U.S.C. § 1681o(a)(1). In order to recover actual damages for a violation of 15 U.S.C. § 1681e(b), "a plaintiff must prove that: (1) his consumer report contains inaccurate information; (2) the credit reporting agency did not follow reasonable procedures to assure maximum possible accuracy of that consumer report; and (3) the plaintiff suffered damages." Thomas v. Equifax Info. Servs., LLC, No. 19CV820, 2021 WL 2291303, at *2 (M.D.N.C. June 4th, 2021) (citing Dalton, 257 F.3d at 415). "Although the Fourth Circuit has not explicitly ruled on . . . § 1681o(a)'s causation requirements, the plain language of each subsection indicates the need for some causal

- 29 -

nexus between the CRA's action or nonaction and the consumer's harm." <u>Ali v. Equifax Info. Servs., LLC</u>, No. 20-CV-173, 2020 WL 6049908, at *3 (E.D.N.C. Oct. 13, 2020) (citing cases from the Third, Fifth, and Seventh Circuit in support of this reading of the statute).

Actual damages can include damages for emotional distress, even if Plaintiff suffered no economic damages. <u>Sloane v. Equifax Info. Servs., LLC</u>, 510 F.3d 495, 502–03 (4th Cir. 2007). However, conclusory statements of emotional harm are insufficient. <u>Id.</u> at 503.

Defendant argues that: (1) Defendant's false report was not the proximate cause of Plaintiff's alleged damages; (2) Plaintiff lied about suffering mental health problems; and (3) the proximate cause of Plaintiff's alleged damages cannot be pinpointed. (Def.'s Br. (Doc. 105) at 24–28.)

While Defendant argues that Plaintiff's false statements on his application is the reason Full House did not hire him, not the false report by Defendant, (<u>Id.</u> at 25), a genuine dispute of material facts exists as to the reason, or reasons, Plaintiff was denied employment at Full House. <u>See</u> <u>supra</u> p. 12. The Court cannot weigh evidence or make credibility determinations at the summary judgment stage. <u>Jacobs v. N.C. Admin. Off. of the Cts.</u>, 780 F.3d 562, 569 (4th Cir. 2015).

Even if Defendant has shown that Plaintiff's false application was the reason Full House did not hire him, Plaintiff still may be able to recover emotional damages. See Dalton, 257 F.3d at 418 ("Even though [the defendant's] false report is not what prevented [the plaintiff] from getting a job with [the plaintiff's potential employer], we are hesitant to say that the district court necessarily would have concluded that [the plaintiff] could not show that [the defendant] caused him any damages on his FCRA claims. . . . [The plaintiff] need only show that he suffered damages from the false report, regardless of how [the plaintiff's potential employer] reacted to the report.")

Plaintiff testified at length about his emotional distress suffered as a result of the false report published by Defendant. (See Scott Dep. I (Doc. 105-1) at 59-63.) He testified he had trouble sleeping, experienced headaches, and suffered from "general malaise" as a result of Defendant's false report. (Id. at 61, 62.)

Defendant argues that Plaintiff lied about suffering from emotional distress because, as part of a medical checkup in February 22, 2021, Plaintiff answered 'no' on a questionnaire that asked him whether he have ever experienced mental health problems. (Def.'s Br. (Doc. 105) at 26.)

Defendant's argument goes to the credibility and weight of Plaintiff's deposition testimony — an issue that cannot be resolved at the summary judgment stage. Jacobs, 780 F.3d at 569.

Defendant argues that the proximate cause of Plaintiff's alleged damages cannot be pinpointed because the damages have "changed in scope" throughout Plaintiff's briefing and thus cannot be "assessed with reasonable certainty." (Def.'s Br. (Doc. 105) at 27 (citing Univ. Computing Co. v. Mgmt. Sci. Am., Inc., 810 F.3d 1395, 1398 (5th Cir. 1987)).)

Defendant further argues that Plaintiff asserted identical damage claims against other consumer reporting agencies in five other cases, thus Plaintiff cannot show with reasonable certainty what emotional distress, reputational harm, and lost wages were proximately caused by Defendant. (Id. at 27.) Defendant cites Univ. Computing Co. v. Mgmt. Sci. Am., Inc., 810 F.3d 1395, 1398 (5th Cir. 1987) in support of its argument. This opinion is not binding on this court. Furthermore, the language Defendant quotes is in reference to establishing damages for lost profits. See id. ("We are required to look to federal law to assess the sufficiency of evidence to prove lost profits . . . .")

Plaintiff asserts "a range of actual damages, including without limitations, loss of employment opportunities, wages and

- 32 -

benefits; loss of economic opportunities and positions and advances in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, frustration, humiliation, and embarrassment." (Compl. (Doc. 1) at 10–11.)

Plaintiff is not claiming lost profits. Plaintiff has testified about the emotional and economic loss he suffered as a result of Defendant's false report. An argument over the scope, or amount, of damages is a factual dispute. Defendant's argument that Plaintiff cannot trace Plaintiff's damages back to Defendant because he alleged similar damages against other consumer reporting agencies does not establish that Defendant is entitled to judgment as a matter of law. It will be an issue for a jury, not the court, to determine what portion of Plaintiff's emotional distress resulted from Defendant's actions, as opposed to other consumer reporting agencies.[8]

---

[8] This court recalls Plaintiff's concession, in order to avoid disclosures in discovery, that the time frame of damages sought by Plaintiff is limited. (Doc. 90 at 5 ("[T]he damages Plaintiff seeks to recover stem from a limited time frame: March 27, 2019, the date Plaintiff was first denied employment due to Defendant Resolve Partners failure to comply with the FCRA, to approximately June 2019, the date Plaintiff secured alternative full-time employment.") The issue of damages will have to be resolved during trial.

- 33 -

## V.   <u>CONCLUSION</u>

For the reasons stated herein, this court will deny Defendant's Motion for Summary Judgment. (Doc. 104.) Issues of material fact exist as to Defendant's policies on verifying criminal records and causation which preclude summary judgment in favor of Defendant.

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 104), is **DENIED.**

This the 29th day of September, 2023.

_____
United States District Judge